UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

MARIE F. G.,

                        Plaintiff,

          -against-

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
---------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

25 Civ. 416 (NSR)(JCM)

Plaintiff Marie F. G.[1] ("Plaintiff") commenced this action on January 15, 2025 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). (Docket No. 1).  Presently before the Court are (1) Plaintiff's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Motion"), (Docket No. 14), accompanied by a memorandum of law, (Docket No. 15) ("Pl. Br."); (2) the Commissioner's opposition to Plaintiff's Motion, (Docket No. 16) ("Comm'r Br."); and (3) Plaintiff's reply, (Docket No. 17) ("Pl. Reply").  For the reasons set forth herein, the Court respectfully recommends that Plaintiff's Motion be denied.

## I. BACKGROUND

Plaintiff was born on September 7, 1988. (R.[2] 31, 195).  She applied for SSI on

---

[1] Plaintiff's name has been partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on May 20, 2025. (Docket No. 8).  On August 14, 2025, Plaintiff's counsel informed the Court that the transcript from the September 5, 2024 administrative hearing was missing from the record. (Docket No. 11).  The Commissioner replaced the administrative record on August 19, 2025 to include the transcript. (Docket No. 13).  For purposes of this Report and Recommendation, the Court will refer to Docket No. 13 as the

September 9, 2022, alleging a disability onset date of January 1, 2022. (R. 17).  Plaintiff's claim

was initially denied on June 21, 2023, and again upon reconsideration on October 17, 2023.

(*Id.*).[3]  Plaintiff then filed a written request for an administrative hearing to review the denial of

her claim. (*Id.*).  Administrative Law Judge Kimberly Schulz ("ALJ Schulz" or the "ALJ") held a

hearing on September 5, 2024. (R. 17, 39-75).  On September 17, 2024, ALJ Schulz issued a

written decision finding Plaintiff not disabled, and thus, not entitled to SSI. (R. 33).  Plaintiff

requested review by the Appeals Council, which was denied on November 20, 2024, (R. 1-5),

making the ALJ's decision ripe for review.

## A. Medical Evidence

### 1. Relevant Medical Evidence

Plaintiff has provided a summary of the medical evidence in the record. (*See* Pl. Br. at 3-

13).  The Commissioner "adopt[ed] Plaintiff's recitation of the relevant facts and underlying

proceedings contained in [her brief] with the exception of any inferences, arguments, or

conclusions asserted therein," and provided additional relevant facts. (Comm'r Br. at 7).  The

Court adopts Plaintiff's summary of the medical evidence, as supplemented by the

Commissioner's summary, as accurate and complete for the purposes of the issues raised in this

suit.  The Court will also summarize the medical evidence pertinent to the adjudication of this

case, as well as findings from certain treating providers and state examiners.

---

certified administrative record.  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration.

[3] During the September 5, 2024 hearing before Administrative Law Judge Kimberly Schulz ("ALJ Schulz" or the "ALJ"), Plaintiff's counsel raised that Plaintiff had a prior application for social security benefits from September 28, 2021, which was denied on March 28, 2022. (R. 43).  Counsel requested that the ALJ reopen the application, as it was still within the 12-month period to do so. (*Id.*).  ALJ Schulz said she would take the request "under advisement." (*Id.*).

**2. Dr. Maria Lorenzo, M.D.**

Dr. Maria Lorenzo, M.D., first treated Plaintiff on March 27, 2023. (R. 2203).  She saw Plaintiff again on May 10, 2023 and December 11, 2023, reporting "no wheezing, no rales, [and] no edema" at each of the three visits. (R. 2208-09).  Dr. Lorenzo prepared a medical source statement dated January 11, 2024, which was an asthma questionnaire diagnosing Plaintiff with "severe persistent asthma." (R. 2206-10).  Plaintiff reported almost daily asthmatic symptoms, including a severe episode leading to an emergency room visit on September 24, 2023. (R. 2207).  Dr. Lorenzo said Plaintiff was referred to an asthma clinic in September 2022, but "lost for follow up." (R. 2208).  Dr. Lorenzo also opined that Plaintiff had several limitations relating to physical activities and work, including that she could (1) lift three-to-five pounds maximum; (2) stand or walk for less than two hours per day; (3) sit for less than six hours per day; and (4) push and/or pull with limits due to numbness and tingling in both hands. (R. 2209-10).  She found that Plaintiff had postural, manipulative, communicative, and environmental limitations. (R. 2210).

**3. Dr. Laiping Xie, M.D.**

On January 20, 2023, Plaintiff had an internal medicine consultative examination with Dr. Laiping Xie, M.D. (R. 1349).  Plaintiff complained of neck and back pain, sciatica, asthma, shortness of breath, post-traumatic stress disorder ("PTSD"), and somatic dysfunction. (*Id.*).  She reported arthritis in her spine, diagnosed in August 2022. (*Id.*).  At the time of the examination, she went to physical therapy once a week. (*Id.*).  She reported neck pain "all day" and "when she move[d] [her] neck wrong," as well as "spastic" lower back pain when cooking and cleaning. (*Id.*).  Plaintiff rated her pain as a five-to-seven out of ten. (*Id.*).  She went to the emergency room at St. Barnabas Hospital on November 21, 2022 because of her sciatica, where she was

treated with a shot and muscle relaxer for the back pain. (*Id.*).  Plaintiff also reported multiple allergies, including dust, molds, pets, pines, pineapple, penicillin, and amoxicillin. (*Id.*).  She told Dr. Xie that she used an albuterol pump and nebulizer to control her asthma, and was starting allergy shots in February 2023. (*Id.*).  She also took Adderall, Seroquel, and Symbicort. (*Id.*).  At the time of her evaluation, Plaintiff lived with her boyfriend and two children. (R. 1350).  Her boyfriend helped with daily chores, but she could typically shower and dress herself. (*Id.*).  She said she did not smoke cigarettes or drink alcohol, but used marijuana daily.[4] (*Id.*).  Her day-to-day activities included watching television. (*Id.*).

On examination, Dr. Xie found that Plaintiff appeared to be in no acute distress. (*Id.*).  She had "normal" gait, used no assistive devices, and could perform half of a full squat. (*Id.*).  She was unable to walk on her heels, but could walk on tiptoes. (*Id.*).  She needed no help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (*Id.*).  The examination revealed no sensory deficits. (R. 1351).  Plaintiff maintained full strength in her upper and lower extremities, as well as full grip strength in both hands. (*Id.*).

Dr. Xie diagnosed Plaintiff with neck and lower back pain, sciatica, asthma, shortness of breath, somatic dysfunction, and PTSD. (R. 1351-52).  He rated Plaintiff's prognosis as "stable." (R. 1352).  Dr. Xie concluded that Plaintiff had "moderate limitation[s] with prolonged standing and walking, climbing stairs, squatting, bending, and turning her neck around." (*Id.*).  He also stated that "[s]he should avoid respiratory irritants related to her asthma." (*Id.*).

## 4. Dr. Joshua Goldstein, Psy.D.

Dr. Joshua Goldstein, Psy.D., conducted a psychiatric consultative evaluation of Plaintiff

---

[4] In her consultative medical evaluation with Dr. Xie, Plaintiff reported having three joints daily. (R. 1350).  In her psychiatric evaluation with Dr. Goldstein, Plaintiff reported "us[ing] 32 blunts of marijuana daily." (R. 1355).

on March 28, 2023. (R. 1354).  Plaintiff's mother drove and accompanied her to the evaluation. (*Id.*).  Dr. Goldstein's report reflects that Plaintiff "completed 11th grade in special education for learning disabilities." (*Id.*).  Plaintiff said she last worked as a self-employed party planner, but stopped when the COVID-19 pandemic began and is "unable to work due to her mental health difficulties." (*Id.*).  Plaintiff reported that "her mother helps her with cooking, cleaning, laundry, shopping and managing money," and that she "only socializes with her boyfriend." (R. 1356).

Plaintiff was hospitalized for a suicide attempt in 2000 and also attempted suicide in 2019. (R. 1354-55).  At the time of Dr. Goldstein's evaluation, Plaintiff saw a therapist every two weeks and a psychiatrist monthly. (R. 1354).  She reported that she had difficulty falling asleep and loss of appetite. (*Id.*).  She experienced depressive and anxiety-related symptoms including "dysphoric moods, excessive crying, loss of usual interest, irritability, diminished sense of pleasure, social withdrawal, and concentration difficulties[,]" as well as "excessive apprehension and worry." (R. 1354-55).  "[A]nhedonia, hopelessness, acute insomnia, anxiety distress, and substance use" exacerbated her depression, and public transportation triggered her anxiety. (*Id.*).  Plaintiff reported suicidal ideation in the thirty days prior to the evaluation, but denied any homicidal ideation. (*Id.*).  She explained that she suffered trauma from multiple instances of sexual abuse and domestic violence. (R. 1355).  Her trauma symptoms included "exposure to trauma, flashbacks, hyperstartle response, nightmares, hypervigilance, avoidance, intrusive thoughts, anger outbursts, and detachment from others." (*Id.*).  Plaintiff did not report panic attacks, but claimed that she suffered psychomotor agitation and paranoid ideation. (*Id.*).  She also reported short-term memory deficits and challenges with reading comprehension, writing, spelling, and math. (*Id.*).

Plaintiff was "defensive, irritable, evasive, and resistant" during the examination, and she

had an "fair" manner of relating, social skills, and overall presentation. (*Id.*). She appeared well-groomed with normal posture and motor behavior, and maintained appropriate eye contact. (*Id.*). Plaintiff was coherent and Dr. Goldstein observed no evidence of hallucinations, delusions, or paranoia. (R. 1355-56). He noted that her attention and concentration were "impaired due to anxiety or nervousness in the evaluation, emotional distress secondary to depression, and [a] history of learning disabilities." (R. 1356). Additionally, Plaintiff's insight and judgment were "poor." (*Id.*). Dr. Goldstein found "moderate evidence of limitation understanding, remembering, or applying simple [and complex] directions and instructions." (R. 1357). He also opined Plaintiff was moderately limited in: (1) using reason and judgment to make work-related decisions; (2) interacting adequately with supervisors, coworkers, and the public; (3) sustaining concentration and performing a task at a consistent pace; (4) sustaining an ordinary routine and regular work attendance; (5) regulating emotions, controlling behavior, and maintaining wellbeing; and (6) being aware of normal hazards and taking appropriate precautions. (*Id.*). During the evaluation, Plaintiff could perform simple counting, but she could not do simple calculations or complete serial threes and sevens.[5] (R. 1356). She recalled 3/3 objects immediately but none after a delay. (*Id.*). In addition, she could count 4 digits forward, but 0 digits backwards. (*Id.*). Overall, Dr. Goldstein assessed Plaintiff's intellectual functioning as below average. (*Id.*).

Dr. Goldstein diagnosed Plaintiff with major depressive disorder, recurrent, mild, with psychotic features; generalized anxiety disorder; PTSD; bipolar I disorder; moderate cannabis use disorder; specific learning disorder, with impairment in reading and mathematics; and attention deficit hyperactivity disorder. (R. 1357). He recommended continued psychological

---

[5] "Serial threes" and "serial sevens" are clinical tests of mental function in which a patient is asked to count down from 100 by subtracting by three and seven, respectively.

and psychiatric treatment, and substance abuse treatment. (*Id.*). He also concluded that Plaintiff needed help managing her funds due to mental health difficulties, current substance use, and a history of learning disability. (R. 1358). He opined that Plaintiff's cognitive problems, psychiatric history, and substance abuse "may significantly interfere with [her] ability to function on a daily basis." (R. 1357).

**5. Dr. D. Brown, Psy.D. and Dr. R. Abueg, M.D.**

At the reconsideration level, Dr. D. Brown, Psy.D., and Dr. R. Abueg, M.D., affirmed Plaintiff's mental and physical residual functional capacity ("RFC"). (R. 88-98). Dr. Brown found that in connection with Plaintiff's psychiatric symptoms, her "medically determinable impairments could have reasonably been expected to produce the alleged symptoms; however, [her] statements concerning the intensity, persistence and muting effects of these symptoms [were] generally not consistent with the evidence of record." (R. 91). Dr. Brown affirmed that Plaintiff had moderate limitations with respect to understanding, memory, sustained concentration, persistence, social interactions, and adaptation, but that she was not significantly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 94-95). The doctor concluded that Plaintiff "retain[ed] the mental capacity to perform the demands of unskilled work on a sustained, competitive basis." (R. 96).

Dr. Abueg opined that Plaintiff could occasionally lift and carry 20 pounds, and could frequently lift or carry 10 pounds. (R. 92). The doctor found that Plaintiff could occasionally crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance, stoop (bend at the waist), and kneel. (*Id.*). Dr. Abueg also concluded Plaintiff had environmental limitations and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, but that she did not "meet or equal listing level severity for obstructive lung disease."

(R. 93). Dr. Abueg additionally opined that the record supported Plaintiff's claim of a history of severe persistent asthma, but noted that her asthma was "poorly controlled" due to Plaintiff's noncompliance with medication. (*Id.*). The doctor affirmed that Plaintiff was limited to light, unskilled work because of her impairments. (R. 97).

**B. Nonmedical Evidence**

**1. Plaintiff's Testimony**

During the September 5, 2024 hearing, Plaintiff was represented by counsel. (R. 41). She stated that the highest level of education she completed was eleventh grade and she received special education through an IEP in high school. (R. 47-48). Plaintiff testified that she was enrolled in a GED program, but did not complete it because she could not receive certain accommodations. (*Id.*). Plaintiff confirmed that she last worked in 2022 as a self-employed party planner. (R. 49-52). She also reported some self-employment earnings in 2019 from being an Uber driver. (R. 50-51). Plaintiff said she lived in a walkup apartment with her two children, a fourteen-year-old daughter and a four-year-old son. (R. 45). She took her son to and from school every day, but sometimes a friend or her brother helped in dropping off or picking up her daughter. (R. 46-47).

Plaintiff testified that she cannot work because she is "irritable," "[e]verything aggravates [her]," and her depression constantly recurs. (R. 52). She said that even if she wanted to have a job, she could not keep it because of how she emotionally and physically feels on a daily basis (*Id.*). Plaintiff also stated that her mental problems would prevent her from getting through an eight-hour day doing a simple job because she cannot complete tasks. (R. 61). She testified that she does not know how to handle stress or take directions from a supervisor. (*Id.*). She also said

she has issues with her memory, "can't keep track of stuff," and would have trouble listening to instructions because she gets lost or distracted easily. (R. 62).

Plaintiff's counsel asked her several questions at the hearing, including about an MRI that was ordered because there were indications she might have multiple sclerosis. (R. 54). Plaintiff testified that the results of that MRI were clear. (R. 55). She also said that she had not recently received any osteopathic treatment because of changes in her insurance. (R. 55-56). She testified that she takes medication every day to manage her mental and physical problems. (R. 56). Plaintiff said she has a lot of pain in her legs and hips while sitting down, that she cannot turn her neck to her shoulder or nod her head, and that she cannot stand for twenty minutes. (R. 57-58). During the hearing, Plaintiff explained she was anxious and suffering from head and back pain, which she rated as a six out of ten. (R. 60). She said this was her usual state. (*Id.*). Plaintiff additionally stated that she took medication for her severe asthma, and that the asthma prevented her from working. (R. 53). Plaintiff testified that she did not smoke cigarettes, but smoked marijuana on weekends to lessen her stress; she said marijuana smoke did not trigger her asthma. (R. 53-54). At the end of the hearing, she testified that since 2023 she has used a cane every day for balance, which was prescribed by an orthopedic doctor. (R. 68-69).

On a typical day, Plaintiff explained that her daughter took care of most household tasks, including cleaning the kitchen and bedrooms. (R. 58-59). Plaintiff said she can only wipe the sink and clean the toilet because those are smaller tasks. (R. 59). Plaintiff testified that she applied for a home attendant in March 2023, but never got one. (*Id.*). Her son's father (who she was separated from at the time of the hearing) previously helped her, but now her brother provides assistance for a few hours per day. (R. 59-60). Plaintiff stated that she can barely travel or walk up the block, and taking the bus or driving to school is "physically and emotionally

impossible because [she does not] want [to be] around people." (R. 60). Plaintiff also testified

that she has no hobbies and while she used to love drawing, she lost interest. (R. 63).

## 2. Vocational Expert's Testimony

Vocational Expert Yaakov Taitz ("VE Taitz") testified at Plaintiff's hearing. (R. 63-67).

The ALJ posed a hypothetical to VE Taitz, asking him to assume an individual of Plaintiff's age,

education, and work experience, who was limited to light work; who could occasionally climb,

crouch, and crawl; who could frequently balance, stoop, and kneel; who could not have

concentrated exposure to fumes, odors, dusts, gases, or poor ventilation; who could understand,

remember, and carry out simple instructions; who could not perform work requiring specific

production rates, such as assembly line work, or work requiring hourly quotas; and who could

have occasional interactions with supervisors, coworkers, and the public. (R. 65). VE Taitz

testified that such an individual could work as a Routing Clerk, 222.687-022, light exertion, with

an SVP 2; Marker, 209.587-034, light exertion, with an SVP 2; or Mail Clerk, 209.687-026, light

exertion, with an SVP 2. (*Id.*). The ALJ then asked VE Taitz to assume the same limitations,

except instead of light work, the individual could perform at a sedentary exertion. (R. 65-66).

VE Taitz testified that such an individual could work as a Ticket Counter, 219.587-010,

sedentary exertion, with an SVP 2; Document Preparer, 249.587-018, sedentary exertion, with an

SVP 2; or Surveillance System Manager, 379.367-010, sedentary exertion, with an SVP 2. (R.

66). VE Taitz confirmed that this testimony was generally consistent with the Dictionary of

Occupational Titles ("DOT"). (R. 67).[6] VE Taitz further testified that an individual limited to

sedentary work who was off task for more than fifteen percent of the day outside of regularly

---

[6] VE Taitz testified that while the jobs of Document Preparer and Surveillance System Monitor were performed differently in today's market than as described in the Dictionary of Occupational Titles, they were still sedentary. (R. 66). For example, today a Document Preparer would scan paper and convert it to a digital format; a Surveillance System Monitor would monitor the entrances and exits of buildings without doormen. (*Id.*).

scheduled breaks, or who required more than one unscheduled absence a month, would be ineligible for all work in the competitive market. (*Id.*).

Plaintiff's representative questioned VE Taitz. (R. 69-73). First, counsel asked if someone who needed to use a cane could do the jobs that the vocational examiner described. (R. 69). VE Taitz responded that because the jobs did not require moving from one location to another, a cane-user could do them. (*Id.*). VE Taitz also confirmed that if a person could only focus fifty percent of the time, they could not do any of the jobs he described. (R. 70). He additionally testified that if a person was off-task half of the time (*e.g.*, if you told someone what to do on a simple basis, and they only remembered what to do half of the time without needing additional instructions), "that would not be tolerated in [a] competitive environment." (R. 70-71). Counsel also posed a hypothetical to VE Taitz about a person who could only regulate their emotions and control their behavior one-to-two thirds of the time. (R. 71). VE Taitz testified that such a person could not do the work he described. (*Id.*). Finally, VE Taitz stated that a person who could only stand for one hour a day and sit for five hours, and who could only move their neck half of the time, could not work in the roles he mentioned. (R. 73).

**3. ALJ Schulz's Decision**

On September 17, 2024, ALJ Schulz denied Plaintiff's application. She determined that Plaintiff had not been under a disability within the meaning of the SSA since September 9, 2022. (R. 17). Applying the five-step procedure established by the Commissioner for evaluating disability claims, ALJ Schulz evaluated Plaintiff's claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); (R. 18-32). At step one, she found that Plaintiff had not engaged in substantial

gainful activity from September 9, 2022, the alleged disability onset date. (R. 19).[7]  At step two, ALJ Schulz determined that Plaintiff had the following severe impairments: (1) cervical and lumbar degenerative disc disease; (2) somatic dysfunction; (3) asthma; (4) borderline personality disorder; (5) major depressive disorder; and (6) learning disorder. (*Id.*).[8]  She determined that these impairments significantly limited Plaintiff's ability to perform basic work activities. (*Id.*). At step three, ALJ Schulz found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpt. P, App. 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). (R. 21). Specifically, the ALJ considered the criteria for disorders of the skeletal spine resulting in compromise of a nerve root, lumbar spinal stenosis resulting in compromise of the cauda equina, and asthma. (*Id.*).  She found that the evidence in the record "[did] not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet the criteria of any listed impairment," and that "no acceptable medical source designated to make equivalency findings [had] ... concluded [otherwise]." (R. 22).

ALJ Schulz further determined that "[t]he severity of [Plaintiff's] mental impairments ... [did] not meet or medically equal" the applicable listing criteria. (*Id.*).  Specifically, she found

---

[7] ALJ Schulz noted that Plaintiff's earnings records indicated she "received self-employment income of $11,612 in 2022, post-[alleged onset date], doing arts and crafts and creating theme centerpieces." (R. 19).  "[Plaintiff] did this for a full year in 2019, and again in 2022, but she was unable to keep with clients, kids, and her relationship," and "had difficulty with daily tasks and would experience meltdowns." (*Id.*).  Accordingly, ALJ Schulz found this work activity did not rise to the level of substantial gainful activity. (*Id.*).

[8] At step two, ALJ Schulz also considered Plaintiff's non-severe medically determinable impairments. (R. 19-20). These included Plaintiff's reported ankle sprain, headaches, blurry vision, knee osteoarthritis, hip and pelvic pain, and limited reading proficiency. (R. 20).  ALJ Schulz determined that "without medically acceptable clinical and/or laboratory diagnostic evidence in the record, there is no basis to determine that [these reported impairments] ... constitute medically determinable impairments on this record." (R. 21).

that the "paragraph B" criteria were not satisfied. (R. 22-23).[9]  She also found that Plaintiff did not establish the "paragraph C" criteria, as her "independence in managing basic functions of daily life, including tak[ing] care of her children and pay[ing] bills" showed Plaintiff could achieve more than "a marginal adjustment to the demands of daily living." (R. 23-24).  ALJ Schulz noted that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process" and that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning." (R. 24).  Thus, the ALJ's RFC assessment "reflect[ed] the degree of limitation [she] ... found in the 'paragraph B' mental function analysis." (*Id.*).

ALJ Schulz determined that Plaintiff had the RFC "to perform light work as defined in 20 C.F.R. § 416.967(b)[.]" (*Id.*).  Specifically, she found that Plaintiff could frequently balance, stoop, and kneel, but could only occasionally crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (*Id.*).  She also stated that Plaintiff must "avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." (*Id.*).  Further, the ALJ determined that Plaintiff "[could] understand, remember, and carry out simple instructions but not work requiring a specific production rate, such as assembly line work or work that requires hourly quotas," and that "she [could] only tolerate occasional interaction with supervisors, coworkers, and the public." (*Id.*).

---

[9] "To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning." (R. 22).  "An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis." (*Id.*).  "A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis." (*Id.*).

In arriving at the RFC, the ALJ examined all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record based on the requirements of 20 C.F.R. § 416.929 and SSR 16-3p. (*Id.*). She "also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c." (*Id.*). ALJ Schulz followed a "two-step process." (*Id.*). First, to determine "whether there [was] an underlying medically determinable physical or mental impairment[] ... that could reasonably be expected to produce [Plaintiff's] pain or other symptoms"; and second, upon showing of such an impairment, to "evaluate the intensity, persistency, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] work-related activities." (*Id.*). The ALJ considered Plaintiff's statements regarding her mental health, including that (1) "[s]he is irritable and easily agitated"; (2) she "feels she cannot work for emotional and physical reasons"; (3) she has "emotional breakdowns, lacks motivation to do anything, and has no desire to be around anyone"; (4) "she feels like she is being watched or followed"; and (5) "[s]he can be very forgetful at times." (R. 25). ALJ Schulz also considered Plaintiff's statements regarding her physical symptoms, including that (1) she never went to the emergency room for her asthma in 2023 and relied on daily asthma medication; (2) she did not smoke cigarettes, but smoked marijuana on weekends to relax; (3) "[s]he is unable to carry a gallon of milk"; (4) "she is unable to sit up and has to lie down all the time"; (4) "[m]oving her head up and down causes migraine headaches, she cannot shake her head 'yes' or 'no,' and she cannot turn her neck to her shoulder"; (5) her children's father was her home attendant, but she now receives help from her brother for four hours a day; and (6) "she relies on a cane to prevent herself from falling, balance, and support for her right leg." (*Id.*).

The ALJ concluded that while Plaintiff's "medically determinable impairment[s] could cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*). While evidence in the record confirmed that Plaintiff had "severe impairments," it "[did] not support a finding that ... render[ed] [her] unable to perform the demands of a wide range of exertionally light work." (*Id.*).

ALJ Schulz summarized the medical and mental health evidence in the record that she reviewed. (R. 25-31). First, she stated that Plaintiff's treatment records "contain evidence of a degree of cervical and lumbar degenerative development." (*Id.*). The ALJ described Plaintiff's lumbar and cervical spine x-rays, radiographic imaging, and MRIs, and explained that the restrictions she incorporated with respect to Plaintiff's physical RFC would "accommodate [her] impediments caused by lumbar and cervical degenerative conditions." (R. 25-26). ALJ Schulz stated that Plaintiff had "segmental and somatic dysfunction of the head, lower extremity, lumbar region, pelvic region, rib case, sacral region, thoracic region, [and] upper extremity," as well as "cervical radicular pain." (R. 26). However, she noted that the record reflected "some indication of improvement following osteopathic treatment," and that the "exertional and postural restrictions [included in the RFC analysis] address these additional maladies." (*Id.*). Further, ALJ Schulz found that Plaintiff's treatment notes "[did] not indicate that [her] impairments [were] so severe as to preclude [her] ability to perform the demands of full-time work. On the contrary, treatment notes show that, upon physical examinations conducted throughout the period relevant to [the ALJ's] decision, [Plaintiff had] exhibited normal findings, including normal functioning and full strength of the extremities, independent mobility without the use of an assistive device, and intact neurological and sensory findings." (*Id.*).

With respect to Plaintiff's use of a cane, ALJ Schulz noted that Plaintiff's testimony was contradictory;[10] she did not mention using a cane until the end of the hearing, and her treatment records did not "substantiate" the representation that "she fell all the time." (R. 26-27). ALJ Schulz concluded that "there [was] no documentation of fall frequency as described in [Plaintiff's] testimony, nor any physical impairments that would likely cause falls on a consistent basis." (R. 27).

With respect to Plaintiff's asthma, the ALJ found no evidence "that it [was] as severe [as] the degree alleged," given that the record "document[ed] no history of asthma attacks or other asthma-related symptoms of such frequency or severity to support a finding of disability." (*Id.*).[11] Nonetheless, ALJ Schulz "incorporate[d] a restriction from concentrated exposure to any respiratory irritants" in her RFC determination. (*Id.*).

ALJ Schulz also detailed the findings from Dr. Xie's January 20, 2023 examination of Plaintiff and Dr. Lorenzo's January 11, 2024 medical source statement. (R. 27-28). She then described how, along with physical impairments, the evidence in the record relating to Plaintiff's mental health "confirm[ed] a diagnoses of borderline personality disorder, major depressive disorder, in partial remission, and a history of learning disability." (R. 28). However, the ALJ found that "the weight of evidence [did] not support a finding that [Plaintiff's] impairment [was] as severe as the degree alleged," given that Plaintiff "[had] consistently exhibited essentially

---

[10] Specifically, ALJ Schulz noted that Plaintiff stated at her hearing that "she can barely walk, she fell all the time, and she relied on a cane everywhere she went." (R. 26). However, Plaintiff also testified "that when she did crafts, she would go to different stores 'all over the place' to get supplies." (*Id.*). In addition, Plaintiff "did not present with a cane at the [consultative examination]." (*Id.*). She went to the emergency room in September 2023 "after hurting her ankle ... while cleaning her apartment," but also testified that she could clean, wipe down the toilet and sink, cook, and walk a block to pick up and drop off her son at school. (*Id.*).

[11] ALJ Schulz also noted that while Plaintiff said "exposure to cigarette smoke [would] necessitate a trip to the ER, ... [she] had a daily marijuana habit that apparently had no impact on her asthma." (R. 27).

normal findings [upon mental status examinations.]" (*Id.*).[12] ALJ Schulz also stated that the treatment record "at times ... reflect[ed] poor impulse control and that [Plaintiff] blames others for problems." (*Id.*). Moreover, the medical evidence showed "indications of some progress" in February 2023, August 2023, October 2023, and April 2024. (*Id.*). ALJ Schulz acknowledged that Plaintiff reported feeling paranoia, but said that treatment notes "consistently reflect[ed] her denial of delusions, paranoia, and perceptive impairments." (*Id.*). Nonetheless, due to Plaintiff's mental health history the ALJ limited her to work "that requires understanding, remembering, and carrying out simple instructions, work that is not performed at a production-rate pace, and with only occasional interaction with supervisors, coworkers, and the public." (*Id.*). ALJ Schulz stated that the results from Dr. Goldstein's March 2023 consultative psychiatric exam similarly "suggest[ed] that [Plaintiff] would best be limited to the performance of simple tasks not performed at a production-rate pace in a low-contact work environment." (R. 28-29).

ALJ Schulz also reviewed and weighed the opinion evidence in the record. (R. 29-31). She found Dr. Xie's report persuasive because the "moderate limitations in prolonged standing, walking, climbing, stairs, bending, and turning neck around," and the suggestion to "avoid respiratory irritants," (R. 29), "were compatible with a restriction to light work duty," (R. 27). Although Dr. Xie did not define 'moderate' or 'prolonged,' the ALJ agreed that the record "support[ed] a certain degree of physical functional limitation." (R. 29). However, the ALJ found that "the overall records [did] not support any significant restriction in [Plaintiff] turning her head." (*Id.*). "Aside from this finding," ALJ Schulz found the report persuasive. (*Id.*).

---

[12] Specifically, these findings included: "cooperative, alert, oriented to time, place, and person, euthymic mood, clean speech, logical thought process, normal perception, no suicidal or homicidal ideation, no memory impairment, unimpaired concentration, intact attention, normal insight, and good judgment." (R. 28).

ALJ Schulz found Dr. Lorenzo's medical source statement unpersuasive. (*Id.*).  She explained that while Dr. Lorenzo said Plaintiff "had symptoms interfering with daily function," the doctor also "reference[d] negative findings on diagnostic and physical examination." (*Id.*).  Thus, Dr. Lorenzo's findings of "significant physical limitations" were "inconsistent [with] underlying treatment records" and the results of Plaintiff's physical exam. (*Id.*).  Further, ALJ Schulz found that "[t]he opinion relating to limited environmental exposure ... is not supported with the chest x-ray of 8/15/2022 negative and exams of December 2023, May 2023, and March 2023 showing no wheezing, rales, or edema." (R. 30).  The ALJ additionally stated that Dr. Lorenzo's opinion was "generally inconsistent" with Dr. Xie's findings. (*Id.*).

ALJ Schulz found Dr. Goldstein's psychiatric consultative examination had limited persuasive value. (*Id.*).  First, she noted that the language Dr. Goldstein used in the report – "moderate evidence of limitation" – was not "vocationally defined" because "[i]t [did] not articulate with precision mental functional limitations for use in a residual functional capacity assessment." (*Id.*).  However, the ALJ found persuasive value in the opinion "only insofar as it indicates there are indeed limitations in the areas of: understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace." (*Id.*).  Based on the record, ALJ Schulz disagreed with Dr. Goldstein's assessment that Plaintiff was limited in "sustaining an ordinary routine and regular attendance at work; regulating emotions, controlling behavior and maintaining well-being and having awareness of normal hazards and taking appropriate precautions." (*Id.*).  Instead, she concluded the record showed Plaintiff could

"manage the activities of daily living, even if she may desire [] assistance in completing physical tasks." (*Id.*).[13]

In reaching these conclusions, the ALJ also "considered the prior administrative findings" and found the state's medical assessment to be persuasive. (*Id.*). "The state medical doctors found that [Plaintiff] retained the capacity to perform light work with frequent balancing, stooping, and kneeling, occasional climbing of ladders, ropes, and scaffolds, climbing of ramps and stairs, crouching, and crawling, and avoiding even moderate exposure to respiratory irritants." (*Id.*). Although the state's doctors did not directly examine Plaintiff, the ALJ found that the medical record "support[ed] a restriction to light work with some modifications on postural activity and exposure to respiratory irritants." (*Id.*). ALJ Schulz noted these findings were consistent with Dr. Xie's assessment that Plaintiff's "physical impairments [were] non-disabling." (*Id.*).

Finally, ALJ Schulz described findings from the state's psychiatric consultants, who determined, based on Dr. Goldstein's evaluation, that Plaintiff was moderately limited in each area of mental functioning. (R. 31). On reconsideration, state psychologist Dr. Brown found that Plaintiff "retained the mental capacity to perform the demands of unskilled work on a sustained, competitive basis." (*Id.*). However, the ALJ explained that "terms like 'unskilled' and ... 'moderate' [were] not vocationally defined, and therefore [did] not adequately articulate the limitation for use in a residual functional capacity assessment." (*Id.*). Thus, she found the opinion persuasive only to the extent it indicated Plaintiff's limitations in "understanding,

---

[13] Specifically, ALJ Schulz noted that Plaintiff "ha[d] daily childcare duties, helping them to get to and from school, and in managing these responsibilities ... demonstrated an awareness of normal hazards and taking appropriate precautions." (R. 30). The ALJ also found that Plaintiff's mental status exams "demonstrate[d] psychiatric stability on prescribed medications over the course of the relevant period." (*Id.*). "Notably, although [Plaintiff] had previously been observed to be irritable in the evaluation setting, she had consistently demonstrated normal hygiene, normal posture, normal motor behavior, appropriate eye contact, clear speech, and a coherent thought process. (*Id.*).

remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace." (*Id.*).  Further, ALJ Schulz said that while Dr. Brown's opinion described Plaintiff as "irritable, [Plaintiff] demonstrated normal hygiene, posture, motor behavior, and eye contract, clear speech, [and] coherent thought process[.]" (*Id.*).  Plaintiff's mental health treatment notes "also demonstrate[d] grossly normal mental status examinations," and that she was "mostly compliant with attendance to scheduled visits." (*Id.*).  Accordingly, in her RFC assessment ALJ Schulz "used more specific, vocationally defined, and policy compliant language to express the moderate limitations arising from [Plaintiff's] mental impairments." (*Id.*).

Overall, ALJ Schulz found evidence in the record that "document[ed] the existence of impairments that reasonably could produce a certain degree of symptoms." (*Id.*).  She concluded that "[r]estricting [Plaintiff] to performing the narrowed range of light, simple tasks not performed at a production-rate pace in a low-contact work setting or requiring certain postural activity or exposure to respiratory irritants ... [would] accommodate[] the extent of [her] alleged symptoms while anticipating the potential for other aggravating factors." (*Id.*).

At step four, the ALJ stated that Plaintiff had no past relevant work. (*Id.*).  At step five, considering Plaintiff's age, which qualified her as a younger individual, her limited education, the transferability of job skills, which was not an issue because Plaintiff did not have past relevant work, and RFC, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*).  Thus, Plaintiff "has not been under a disability ... since September 9, 2022." (R. 32).

## II.  DISCUSSION

Plaintiff argues that ALJ Schulz's decision should be reversed and remanded for further

administrative proceedings because the ALJ failed to properly (1) evaluate the medical opinion evidence; and (2) determine Plaintiff's mental and physical RFC. (Pl. Br. at 14).  The Commissioner maintains that (1) the ALJ's decision is supported by substantial evidence; and (2) "the ALJ appropriately considered and evaluated the relevant evidence of record." (Comm'r Br. at 6).

## A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (*per curiam*) (quoting 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration ("Administration") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is

other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (*per curiam*).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the [Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id*. (quoting *Consol. Edison*, 305 U.S. at 229).  The substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id*.

On January 18, 2017, the Administration considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply

to the instant case. Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Consequently, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions ...." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael H. v. Saul*, 5:20-CV-417 (MAD), 2021 WL 2358257, at \*6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner – for instance, whether the claimant is disabled under the SSA – are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

**B.  The ALJ's Duty to Develop the Record**

As a threshold matter, the Court must be satisfied that the record is fully developed before determining whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*, 19-CV-1539 (AT)(JLC), 2020 WL 2212404, at \*9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ has satisfied this duty to develop the record is a threshold question.").  "[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525

(LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "This duty is present even when a claimant is represented by counsel[.]" *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order).  "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).

Here, the Court finds no obvious gaps in the record.  There are close to three thousand pages of medical treatment records, medical opinions from the consultative examiner, records from the disability examiner, and the hearing records. *See supra* Section I.  On August 14, 2025, Plaintiff's counsel informed the Court that the transcript from the September 5, 2024 administrative hearing was missing from the record. (Docket No. 11).  The Commissioner supplemented the administrative record on August 19, 2025 to include the transcript. (Docket No. 13).  This appears to be the only issue relating to completeness of the record raised by counsel, and it was promptly resolved.  Moreover, Plaintiff does not dispute that the record was fully developed, and Plaintiff's counsel confirmed the same at the 2024 hearing. (R. 43).[14]

Accordingly, the Court recommends finding that ALJ Schulz fulfilled her duty to develop the record.

---

[14] At the September 5, 2024 hearing, ALJ Schulz asked Plaintiff's counsel if he objected to any of the records in evidence. (R. 44).  Counsel noted that pages 10 through 12 appeared to belong to a different claimant, and the ALJ confirmed that she would redact those pages from the record. (*Id.*).

**C. The ALJ's Residual Functional Capacity Determination**

The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). (R. 24). She acknowledged that Plaintiff's ability to perform all or substantially all the requirements of this level of work was "impeded by additional limitations,"[15] but found Plaintiff could perform a "narrowed range of light, simple tasks not performed at a production-rate pace in a low-contact work setting or requiring certain postural activity or exposure to respiratory irritants." (R. 31-32). ALJ Schulz concluded that this type of light work exists in significant numbers in the national economy for an individual of comparable age, education, work experience, and RFC, including work as a routing clerk, marker, or charge mail clerk. (*Id.*).

The Court "conduct[s] a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citation omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner." *Id.* The ALJ must weigh all of the available evidence to make an RFC determination that is consistent with the record. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 225 (E.D.N.Y. 2021) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)).

"The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his [or her]

---

[15] These limitations included "avoid[ing] concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." (R. 24). ALJ Schulz also said Plaintiff cannot perform work "requiring a specific production rate, such as assembly line work or work that requires hourly quotas," and that she "can only tolerate occasional interaction with supervisors, coworkers, and the public." (*Id.*).

impairments." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545). "The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 640 (S.D.N.Y. 2019) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)); *see also Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis.") (citing 20 C.F.R. § 404.1545(a)). "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254 (BMC), 2014 WL 1599944, at *8 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12-CV-1595 (NAM)(ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted). The RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (summary order). When the RFC is supported by substantial evidence in the record, the Court will uphold it. *Zacharopoulos*, 516 F. Supp. 3d at 226 (citing *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015)).

The Commissioner may also consider a claimant's daily activities in the RFC analysis. *See Perez-Rodriguez v. Astrue*, No. 10 Civ. 9346 (NRB), 2011 WL 6413763, at *5 (S.D.N.Y. Dec. 21, 2011); *see also* 20 C.F.R. § 404.1512(b). Courts in the Second Circuit have held that an individual's ability to complete basic daily activities "does not, in itself, contradict a claim of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 (ENV)(MDG), 2011 WL

1004696, at *5 (E.D.N.Y. Mar. 18, 2011) (quoting *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)).  Nevertheless, the regulations state that the Commissioner will consider Plaintiff's daily activities as one factor in determining the severity of Plaintiff's impairments. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 1. Plaintiff's Mental RFC

Plaintiff argues that ALJ Schulz erred in her mental RFC determination because she failed to properly evaluate the medical opinion evidence. (Pl. Br. at 14).  Specifically, Plaintiff maintains that the ALJ's analysis "regarding the persuasiveness of opinions from Dr. Goldstein and the non-examining consultants cannot be reconciled with the examiners' findings that Plaintiff "has limitations in the areas of: "understanding, remembering, and applying information; interacting with others; [and] concentrating, persisting, and maintaining pace." (*Id.* at 15).  Plaintiff asserts that ALJ Schulz erred by finding Plaintiff "less limited than every medical expert in the record without identifying fundamental errors in their opinions," thus the ALJ's mental RFC determination was "based on her lay judgment of the medical evidence." (Pl. Reply at 3).  Plaintiff also argues that ALJ Schulz did not "reconcile apparent conflicts between the testimony of [VE Taitz] and the description of jobs in the DOT, which ... could not be performed if the ALJ accurately credited the opinions from the psychiatric consultant[s] that she relied upon." (Pl. Br. at 17).

The Commissioner asserts that ALJ Schulz "properly assessed the opinion evidence of record and supportably determined that Plaintiff could perform a reduced range of light work." (Comm'r Br. at 6).  In addition, the Commissioner maintains that courts in this Circuit "[have] found that moderate limitations in mental functioning are not inconsistent with an RFC for unskilled work." (*Id.* at 14) (internal quotations and citations omitted).  Finally, the

Commissioner argues that Plaintiff has failed to carry her burden to establish a more restrictive RFC." (*Id.*).

Plaintiff's arguments ignore ALJ Schulz's thorough review of the entire record in making her mental RFC determination, which is supported by substantial evidence. First, the ALJ considered Plaintiff's hearing testimony, in which she testified about her daily childcare duties, including bringing her son to and from school, and helping and arranging for her daughter to get to and from school. (R. 30, 46-47). The ALJ found that "in managing these responsibilities, [Plaintiff] demonstrated an awareness of normal hazards and taking appropriate precautions." (R. 30). Plaintiff also testified that while she sometimes required assistance in completing physical tasks, and that she received a lot of household help from her fourteen-year-old daughter, she could cook and do some cleaning. (R. 30, 58-59). In addition, ALJ Schulz relied on other medical and non-medical evidence beyond Plaintiff's daily activities in support of her mental RFC findings. For example, when assessing Plaintiff's mental symptoms, ALJ Schulz considered that the treatment record at times reflected poor impulse control and that Plaintiff blamed others for problems, that she had indications of progress (like taking a virtual college class in February 2023 and making and selling bracelets in August 2023), and that she "demonstrated insight by acknowledging the negative effects of smoking marijuana." (R. 28). The ALJ also noted that while Plaintiff testified to feeling like she was being followed or watched when leaving the house, (R. 60), her treatment notes "consistently reflect[ed] her denial of delusions, paranoia, and perceptive impairments," (R. 28).

Additionally, the ALJ properly relied on the medical opinion evidence to conclude that Plaintiff's mental symptoms would not preclude her from light work. *See Barber v. Comm'r of Soc. Sec.*, 6:15-CV-0338 (GTS)(WBC), 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) ("It

is well established that an ALJ may rely on the medical opinions provided by State agency

consultants and that those opinion[s] may constitute substantial evidence."); *Camille v. Colvin*,

652 F. App'x 25, 28 (2d Cir. 2016) (finding that the ALJ appropriately relied on state agency

physician's opinion because it was "most consistent with the record as a whole"); *Frye ex rel.*

*A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical

consultant constitutes expert opinion evidence which can be given weight [and relied upon by the

ALJ] if supported by medical evidence in the record.").

Plaintiff's reliance on the recent Second Circuit decision in *Nunez v. Comm'r of Soc.*

*Sec.*, 164 F.4th 60 (2d Cir. 2025), is misplaced.  In *Nunez*, the Second Circuit held that the ALJ

"failed to support the determination of his mental RFC with substantial evidence." *Id.* at 70.  The

Second Circuit found that the ALJ failed to address Nunez's ability to attend work and stay on

task because opinion evidence in the record did not support finding that he could "sustain an

ordinary work routine." *Id.* at 71.  Specifically, two medical opinions concluded that Nunez

"would likely miss two or more days of work per month," and "the medical opinions in the

record consistently concluded that Nunez had at least moderate limitations in his ability to

maintain a regular work routine." *Id.* at 72-73.  However, the RFC "did not mention any of

Nunez's limitations regarding his ability to maintain regular work attendance or stay on task, or

how that limitation could be addressed in the workplace." *Id.* at 69.  Instead, "the ALJ's RFC

determination's only mention of Nunez's ability to stay on task [was] an implicit one: that 'he

require[d] a setting that [was] goal-oriented.'" *Id.* (internal citation omitted).  The Second Circuit

noted that while "'[n]othing in the regulation indicates that an ALJ's ultimate [RFC]

determination ... must comport with a specific medical opinion,' the lack of a medical opinion

that supports the ALJ's conclusion [was] 'not insignificant.'" *Id.* at 71-72 (quoting *Rubin v.*

*O'Malley*, 116 F.4th 145, 155-56 (2d Cir. 2024)).  Thus, the Second Circuit found that "[t]he failure to account for Nunez's likelihood of absences and unproductive time, particularly considering the largely unrebutted evidence that Nunez will be absent from work and off task to an extent that the vocational expert testified is disabling, warrant[ed] remand." *Id.* at 73. Furthermore, in *Nunez* the Court could not find "*any* justification for the ALJ's RFC determination," in large part because the medical opinions in the record did not support the ALJ's conclusion. *Id.* at 71 (emphasis in original).

In contrast, here the opinion evidence (and overall administrative record), supports ALJ Schulz's finding that Plaintiff had the "capacity to sustain an ordinary routine and regular attendance at work." (R. 30).  Although Dr. Goldstein assessed that Plaintiff was moderately limited in her ability to sustain a routine and regular work attendance, (R. 1357), Dr. Brown found that Plaintiff "retained the mental capacity to perform the demands of unskilled work on a sustained, competitive basis," (R. 96).  Moreover, ALJ Schulz found Dr. Goldstein's assessment unpersuasive because significant evidence in Plaintiff's treatment record indicated she could attend work and stay on task. (R. 30).  For example, although Plaintiff testified she could not keep a job because of her emotional and physical symptoms, including that "on a day-to-day basis [she has] no desire of getting up [or] wanting to do anything, (R. 52), the ALJ noted that Plaintiff had "daily childcare duties, [including] helping [her children] get to and from school," (R. 30).  "[I]n managing these responsibilities," ALJ Schulz found Plaintiff demonstrated "a capacity to sustain an ordinary routine and regular attendance at work," as well as "an ability to manage activities of daily living." (*Id.*).  Other record evidence, like Plaintiff's mental status exams, showed "psychiatric stability on prescribed medications [and] compliance with the treatment regimen, including attendance at regularly scheduled visits." (*Id.*).  In *Nunez*, all the

opinion evidence consistently concluded that the claimant had "at least moderate limitations in his ability to maintain a regular work routine." 164 F.4th at 72.  In contrast, ALJ Schulz cited both opinion and treatment record evidence indicating that Plaintiff could sustain a routine and attend work regularly. (R. 30).

Further, unlike in *Nunez*, where the Second Circuit found that the ALJ did not account for any of Nunez's attendance-related limitations despite opinion evidence explicitly stating he would likely miss two or more days of work per month, *see* 164 F.4th at 72-73, no opinion evidence on this record limits Plaintiff's attendance and routine-maintenance abilities so stringently.  There were, however, limitations arising from Plaintiff's mental impairments that ALJ Schulz acknowledged and incorporated in her RFC determination. (R. 24, 28, 30-31).  The opinion evidence showed Plaintiff had limitations relating to "understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace." (R. 31).  Thus, the RFC intentionally restricted Plaintiff "to performing [a] narrowed range of light, simple tasks not performed at a production-rate pace in a low-contact work setting" in order to "accommodate[] the extent of [Plaintiff's] alleged symptoms while anticipating the potential for other aggravating factors." (*Id.*).  In *Nunez*, the Second Circuit remanded because "'the evidence of record [did not] permit[] [the court] to glean the rationale of [the] ALJ's decision.'" 164 F.4th at 71 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).  The same cannot be said here.

The Second Circuit also found that "some aspects of the ALJ's evaluation of the medical opinions evidence [were] not supported by substantial evidence" because "despite support from medical records and treatment notes, the ALJ found all the medical opinions in the record, except for one portion of [an independent consultative examiner's opinion], unpersuasive." *Id.* at 73.

The Circuit held that the record "[did] not contain substantial evidence to support a rejection of all the medical opinions for lack of consistency," particularly because "each rejected opinion was largely consistent with the others," as well as with treatment notes and "Nunez's own testimony of anxiety symptoms." *Id.* at 74.

This case is distinguishable because, in making her determination about Plaintiff's mental RFC, ALJ Schulz assessed the opinion evidence and explained which opinions she found more consistent with the record as a whole. The ALJ acknowledged that "the evidence of mental health record confirm[ed] a diagnoses of borderline personality disorder, major depressive disorder, in partial remission, and a history of learning disability," but found "that the weight of evidence [did] not support a finding that [Plaintiff's] impairment is as severe as the degree alleged." (R. 28). "On the contrary, upon mental status examinations, [Plaintiff] ... consistently exhibited essentially normal findings, including cooperative, alert, oriented to time, place, and person, euthymic mood, clean speech, logical thought process, normal perception, no suicidal or homicidal ideation, no memory impairment, unimpaired concentration, intact attention, normal insight, and good judgment." (*Id.*). "Due to this mental health history," ALJ Schulz limited Plaintiff to work "requir[ing] understanding, remembering, and carrying out simple instructions, work that is not performed at a production-rate pace, and with only occasional interaction with supervisors, coworkers, and the public." (*Id.*).

ALJ Schulz found that Dr. Goldstein's consultative psychiatric exam supported her finding that Plaintiff "would best be limited to the performance of simple tasks not performed at a production-rate pace in a low-contact work environment." (R. 28-29). However, she explained that the language Dr. Goldstein used in his report – "moderate evidence of limitation" – was not "vocationally defined" and "[did] not articulate with precision mental functional limitations for

use in a residual functional capacity assessment." (R. 30).  State psych consultant, Dr. Brown, found Plaintiff "retained the mental capacity to perform the demands of unskilled work on a sustained, competitive basis." (R. 31).  Similarly, ALJ Schulz stated that "unskilled" is not a vocationally defined term and did not "adequately articulate the limitation for use in a[n] [RFC] assessment." (*Id.*).  Thus, she found Dr. Goldstein's and Dr. Brown's opinions persuasive only to the extent they indicated Plaintiff was limited "in the areas of: "understanding, remembering, and applying information; interacting with others, concentrating, persisting, and maintaining pace." (R. 30-31).  While these opinions were consistent with each other, ALJ Schulz explained that they were not consistent with the totality of the medical record, nor with Plaintiff's mental health treating notes. *See Nunez*, 164 F.4th at 74; (R. 30-31).  20 C.F.R. § 404.1520c(c)(2) explains "that a medical opinion is 'more persuasive' if consistent 'with the evidence from other medical sources and nonmedical sources in the claim.'" *Nunez*, 164 F.4th at 74.

Further, as discussed, *supra*, ALJ Schulz found unpersuasive Dr. Goldstein's assessment that Plaintiff was limited in "sustaining an ordinary routine and regular attendance at work; regulating emotions, controlling behavior and maintaining well-being and having awareness of normal hazards and taking appropriate precautions." (R. 30).  Instead, the ALJ assessed that the record supported Plaintiff's "capacity to sustain an ordinary routine and regular attendance at work," as well as "an ability to manage activities of daily living." (*Id.*).  Plaintiff's mental status exams were "grossly normal"; she also showed "compliance with the treatment regimen" and "psychiatric stability on prescribed medications." (*Id.*).  Though she was "irritable in the evaluation setting," Plaintiff "demonstrated normal hygiene, posture, motor behavior, and eye contact, clear speech, coherent thought process, [and the ability] to do simple counting, but not calculations." (R. 30-31).  Thus, ALJ Schulz "properly considered and weighed [the opinion

evidence] relating to Plaintiff's mental health limitations." *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp 3d. 389, 396 (W.D.N.Y. 2018).  Hence, her assessment of Plaintiff's mental RFC "used more specific, vocationally defined, and policy compliant language to express the moderate limitations arising from [Plaintiff's] mental impairments." (R. 31).

Plaintiff also asserts that ALJ Schulz's "mental RFC finding [did] not include any limitations in Plaintiff's ability to understand, remember, and perform 'very short' and simple instructions or use reason and judgment to make work-related decisions," nor did the ALJ "provide any explanation for failing to include such significant limitations in the RFC finding despite allegedly agreeing with medical opinions describing such restrictions." (Pl. Br. at 15-16). An ALJ's failure to "adequately explain why [she] failed to include any limitations to account for Plaintiff's [moderate] mental limitations [would be] error" warranting remand. *Felix S. v. Comm'r of Soc. Sec.*, 630 F. Supp. 3d 423, 430 (S.D.N.Y. 2022).  However, Plaintiff's assertion that ALJ Schulz failed to explain or limit her RFC determination to account for Plaintiff's mental health condition falls flat.  In fact, as discussed, *supra*, the ALJ considered Plaintiff's alleged psychiatric limitations, but found them inconsistent with the full record. (R. 30-31).  Further, to address Plaintiff's mental health history and condition, ALJ Schulz specifically limited her to work requiring "understanding, remembering, and carrying out simple instructions, ... that is not performed at a production-rate pace, and with only occasional interaction with supervisors, coworkers, and the public." (R. 28).  The ALJ's RFC determination "accommodate[d] the extent of [Plaintiff's] alleged symptoms while anticipating the potential for other aggravating factors." (R. 31).

In addition, courts in this Circuit have "found that moderate limitations in mental functioning are not inconsistent with an RFC for unskilled work." *Aponte v. Kijakazi*, 692 F.

- 34 -

Supp. 3d 257, 268 (S.D.N.Y. 2023) (quoting *Lee W. v. Comm'r of Soc. Sec.*, 2021 WL 1600294, at *6 (W.D.N.Y. Apr. 23, 2021)); *see also Morales v. Berryhill*, 484 F. Supp. 3d 130, 150 (S.D.N.Y. 2020) ("[A] moderate limitation in the area of concentration, persistence, or pace would not necessarily preclude the ability to perform unskilled work.") (quoting *Lowry v. Comm'r of Soc. Sec.*, 1:15-CV-1553 (GTS)(WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017)).  As SSA regulations "explain that 'the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people)[,]' ... [u]nskilled work, by definition, already accounts for limitations in mental functioning, including limitations interacting with others and learning new tasks." *Lee W.*, 2021 WL 1600294, at *6 (quoting 20 C.F.R. Part 404, Subpt. P, App. 2 § 202.00(g)).

Finally, Plaintiff argues that the medical opinions indicating she is "limited in her capacity to perform ... 'very short' directions/tasks [are] explicitly inconsistent with the requirements of the jobs that the ALJ found Plaintiff can perform." (Pl. Br. at 16).[16]  She asserts that ALJ Schulz "failed to reconcile apparent conflicts between [VE Taitz's] testimony ... and the description of jobs in the DOT, which makes clear that the [jobs of routing clerk, marker, and mail clerk] could not be performed if the ALJ accurately credited the opinions from the psychiatric consultant[s] that she relied upon." (*Id.* at 17).  Specifically, Plaintiff maintains that "jobs with a reasoning level of 2 require carrying out 'detailed' instructions as part of the job." (*Id.*) (internal citation omitted).  However, "a growing number of courts have held that jobs with DOT reasoning levels of two or three are compatible with limitations to simple, routine work." *Haiss v. Berryhill*, No. 17-CV-8083 (VB)(LMS), 2019 WL 3738624, at *11 (S.D.N.Y. May 15,

---

[16] Plaintiff additionally contends that VE Taitz "was unable to address the issue of the reasoning level because the ALJ did not appraise the VE that [she] intended to find [Plaintiff] limited from performing detailed tasks to single-step tasks/instructions." (Pl. Br. at 17-18).  However, as the Commissioner points out, "the ALJ did not so limit Plaintiff." (Comm'r Br. at 15).

2019)(collecting cases); *see also Marcano v. O'Malley*, 23 Civ. 5553 (NSR)(JCM), 2024 WL 4710184, at *9 (S.D.N.Y. June 21, 2024) ("[C]ourts in this Circuit agree that scores of SVP-2 assigned to the representative occupations by the DOT are consistent with the ability to perform simple, low-stress, unskilled work."); *Napolitano v. Kijakazi*, No. 21-CV-10470 (JLC), 2023 WL 3185511, at *17 (S.D.N.Y. May 2, 2023) (same).

Further, when questioning the vocational expert, ALJ Schulz specifically asked him whether there were jobs existing in the national economy for an individual who could "understand, remember, and carry out simple instructions," which is what the ALJ determined Plaintiff was capable of based on her thorough review of the record. (R. 65-66). The ALJ also explicitly asked VE Taitz if his testimony was consistent with the DOT, which he confirmed. (R. 67). Therefore, the Court disagrees with Plaintiff's assertion that the ALJ did not "reconcile" VE Taitz's testimony with the medical opinion evidence and other evidence in the record, as well as Plaintiff's contention that there are "inconsistencies between the vocational expert's testimony and the DOT." (Pl. Br. at 17-18).

Plaintiff has not pointed to any evidence the ALJ overlooked. She simply disagrees with the ALJ's conclusion regarding her mental RFC. It is the ALJ's role to "weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Plaintiff has the burden to show that no reasonable factfinder could have reached the ALJ's conclusion based on the evidence in the record. *Brault*, 683 F.3d at 448. Plaintiff has not made such a showing here.

Accordingly, the Court respectfully recommends finding that the ALJ's mental RFC determination is supported by substantial evidence.

## 2. Plaintiff's Physical RFC

As discussed, *supra* Section II.C, ALJ Schulz determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). (R. 24, 32).  The ALJ acknowledged that Plaintiff had certain physical limitations, including that she could only occasionally crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (R. 24).  She also acknowledged that Plaintiff's treatment records "contain[ed] evidence of a degree of cervical and lumbar degenerative development," but concluded that these impairments did not "render [her] unable to perform the demands of a wide range of exertionally light work." (R. 25).

Plaintiff argues that ALJ Schulz "failed to properly determine that Plaintiff retained the physical RFC to perform light exertional work." (Pl. Br. at 18).  Specifically, Plaintiff submits that Dr. Xie's opinion, which the ALJ found persuasive, "is not consistent with the ability to perform light exertional work." (*Id.* at 19).  The Commissioner maintains that the ALJ "considered Plaintiff's symptoms in relation to the objective medical evidence," and "cited substantial evidence" to support the RFC determination for a reduced range of light work. (Comm'r Br. at 13).

Here, the ALJ properly relied on state agency opinion evidence that Plaintiff's physical symptoms would not preclude her from light work. *See Barber*, 2016 WL 4411337, at *7.  In doing so, ALJ Schulz assessed the opinion evidence, and explained which opinions she found more consistent with the record as a whole.  The ALJ found Dr. Xie's opinion – which determined that Plaintiff had "moderate limitation with prolonged standing and walking, climbing stairs, squatting, [and] bending," (R. 1352) – persuasive, (R. 29).[17]  Although Dr. Xie

---

[17] Dr. Xie also found that Plaintiff had moderate limitations in turning her neck, (R. 1352), but the ALJ determined the "overall records [did] not support any significant restriction" in Plaintiff's ability to turn her neck, (R. 29).  Other than this finding, ALJ Schulz concluded Dr. Xie's opinion was persuasive. (*Id.*).

did not define the terms "moderate" or "prolonged," the medical evidence, "including the findings on osteopathic manipulative treatments, support[ed] a certain degree of physical functional limitation." (*Id.*). The ALJ noted that Dr. Xie's exam showed Plaintiff had some limits in her cervical spine motion, but "otherwise demonstrated full range of motion in the joints of the bilateral upper extremities." (*Id.*). In addition, during Dr. Xie's examination Plaintiff changed without assistance, "had a normal gait," showed "full strength in the upper and lower extremities," and "there were no sensory deficits or edema." (*Id.*). Dr. Abueg affirmed Plaintiff's physical RFC at the reconsideration level, opining that she could occasionally lift and carry 20 pounds, occasionally crouch, crawl, and climb ramps, stairs, ladders, ropes, scaffolds, and could frequently lift or carry 10 pounds, balance, stoop, and kneel. (R. 92). ALJ Schulz found Dr. Abueg's assessment similarly persuasive because evidence in the medical record, "including the expanded record at the hearing level, support[ed] a restriction to light work with some modifications on postural activity." (R. 30).

In contrast, the ALJ did not find Dr. Lorenzo's treating source opinion persuasive, because Dr. Lorenzo's conclusion that Plaintiff had "significant physical limitations"[18] was "inconsistent [with] the underlying treatment records and results on physical exam showing full strength in the extremities, full, bilateral grip strength, and intact hand and finger dexterity." (*Id.*). Dr. Lorenzo's opinion that Plaintiff could not work a full eight-hour workday and had "manipulative limitations" was also "inconsistent with treatment notes from [St. Barnabas Hospital] Health Systems showing grip strength equal and strong bilaterally." (R. 29-30). ALJ Schulz concluded that the limitations identified by Dr. Xie and the state medical doctors were

---

[18] Specifically, Dr. Lorenzo "limited [Plaintiff] to lifting and carrying no more than 3-5 pounds, standing and walking less than two hours per day, sitting less than 6 hours a day, and postural, manipulative, [and] communicative ... limitations due to daily symptoms and tingling in the hands." (R. 29; R. 2209-10).

more consistent with medical record evidence than Dr. Lorenzo's opinion, ultimately "finding [Plaintiff's] physical impairments non-disabling." (R. 30).  Thus, the ALJ did not err when relying on Dr. Xie's and state agency doctors' opinion evidence in supporting her administrative decision and physical RFC findings.

Plaintiff also argues that because Dr. Xie found she has "moderate limitations" for prolonged standing and walking, she does not have "the ability to perform light exertional work, which requires standing/walking ... at least six hours [per day]." (Pl. Br. at 18-19).  However, the Commissioner asserts that the ALJ did not "wholly adopt Dr. Xie's finding of 'moderate limitations in prolonged standing [and] walking,'" but rather "found only that the evidence of record supported a certain degree of physical functional limitation." (Comm'r Br. at 16).  Further, the Commissioner notes that "even if the ALJ had fully adopted the finding of 'moderate' limitations, courts have routinely held that moderate physical limitations, including in walking and standing, are commensurate with an ability to perform light work." (*Id.*).  Indeed, courts in this District have found that moderate physical limitations are consistent with physical exertion at or above the sedentary level. *See Claudene M. v. Comm'r of Soc. Sec.*, 1:24-CV-07185 (GRJ), 2025 WL 1736588, at *5 (S.D.N.Y. June 23, 2025) ("[A] number of courts have found that 'moderate' limitations for standing, walking, sitting, and lifting are consistent with the ability to do light work.") (quoting *Jordan v. Comm'r of Soc. Sec.*, 16-cv-9634 (KHP), 2018 WL 1388527, at *10 (S.D.N.Y. Mar. 19, 2018)); *see also Narcisa P. v. Comm'r of Soc. Sec.*, 1:23-CV-10962 (GRJ), 2025 WL 673475, at *4 (S.D.N.Y. Mar. 3, 2025) (same); *Guzman v. Comm'r of Soc. Sec.*, 21-CV-6538 (KHP), 2022 WL 3013108, at *6 (S.D.N.Y. July 29, 2022) ("[The consultative examiner's] opinion that Plaintiff had only moderate limitations in reaching, standing, walking, bending, lifting and climbing stairs is consistent with an RFC that Plaintiff

can perform sedentary work" and "such moderate limitations are generally consistent with the even less restrictive RFC of light work."); *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 345-46 (S.D.N.Y. 2020) (The ALJ's assessment that plaintiff could perform light work "under a number of additional limitations ... is entirely in line with [the consultative examiner's] conclusion that ... [plaintiff] had mild to moderate limitations for prolonged walking and climbing stairs.") (internal quotations and citations removed).  Thus, while Plaintiff asserts that she "cannot perform light exertional work" due to her moderate limitations, (Pl. Br. at 18-19), this conclusory assertion is not supported by the evidence in the record, nor by case law.

With respect to Plaintiff's respiratory issues, the ALJ again properly relied on state agency opinion evidence, as well as other medical evidence in the record, to determine that Plaintiff's asthma would not preclude her from light work. *See Barber*, 2016 WL 4411337, at *7. Dr. Xie opined that Plaintiff should avoid respiratory irritants, (R. 1352), which Dr. Abueg affirmed,[19] (R. 94).  The ALJ found these opinions about Plaintiff's asthma-related limitations to be persuasive. (R. 29).  However, ALJ Schulz concluded that Dr. Lorenzo's medical source statement relating to Plaintiff's asthma was not supported by the record. (*Id.*).  Dr. Lorenzo opined that Plaintiff had "environmental limitations due to daily symptoms." (*Id.*).  The ALJ found this unpersuasive based on "negative diagnostic and clinical findings," including a negative August 2022 chest x-ray and March, May, and December 2023 pulmonary examinations that "show[ed] no wheezing, rales, or edema." (R. 29-30).  Instead, the ALJ determined that the record evidence supported "some modifications on ... exposure to respiratory

---

[19] Dr. Abueg concluded Plaintiff had environmental limitations, specifically to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, but noted that Plaintiff did not "meet or equal listing level severity for obstructive lung disease." (R. 93).  She additionally opined that the record supported Plaintiff's claim of a history of severe persistent asthma, but that her asthma was "poorly controlled related to [Plaintiff] being noncompliant [with] meds." (*Id.*).

irritants." (R. 30).

Further, ALJ Schulz noted that Plaintiff's April 2023 spirometry and pulmonary function testing did not meet the parameters for her asthma to be of "listing-level severity," including that she had no record of "exacerbations of complications from asthma necessitating three hospitalizations within a 12-month period and at least 30 days apart." (R. 22).  Instead, "[t]he record reflect[ed] some visits to the ER and one hospitalization in August 2022." (*Id.*).  Thus, it was appropriate for the ALJ to rely on state agency opinion evidence and other medical records in supporting her administrative decision regarding Plaintiff's physical and respiratory limitations.

Finally, the Commissioner argues that Plaintiff has failed to carry her burden to establish a more restrictive RFC because "substantial evidence supports the ALJ's RFC determination, and Plaintiff has failed to identify any legal error." (Comm'r Br. at 14, 17).  "Instead, Plaintiff discusses certain pieces of medical evidence and opinion evidence in the record that she believes support a finding of continued disability." (*Id.* at 17) (quoting *Jessica P. v. Comm'r of Soc. Sec.*, 24 Civ. 4834 (AEK), 2025 WL 2506013, at *7 (S.D.N.Y. Sept. 2, 2025)).  The Court agrees. Here, ALJ Schulz "weigh[ed] all of the evidence available [and made] an RFC finding that was consistent with the record as a whole." *Matta*, 508 F. App'x at 53.  She recognized Plaintiff had "impairments that reasonably could produce a certain degree of symptoms," and which could impede or limit her "ability to perform all or substantially all of the requirements of [a light] level of work." (R. 31-32).  Nonetheless, the ALJ found that Plaintiff could still perform the requirements of certain representative occupations. (*Id.*).  Therefore, ALJ Schulz concluded that "restricting [Plaintiff] to performing [a] narrowed range of light, simple tasks not ... requiring certain postural activity or exposure to respiratory irritants ... [would] accommodate[] the extent

of [her] alleged symptoms while anticipating the potential for other aggravating factors." (R. 31). Again, Plaintiff has not pointed to any evidence the ALJ overlooked in determining her physical RFC, but merely disagrees with the ALJ's conclusion.  Thus, Plaintiff has not met her burden to show that no reasonable factfinder could have reached the ALJ's conclusion with respect to her physical RFC based on the evidence in the record. *See Brault*, 683 F.3d at 448.

Accordingly, the Court respectfully recommends finding that the ALJ Schulz's physical RFC determination is supported by substantial evidence.

## III.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend denying Plaintiff's Motion.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed R. Civ. P. 6(a).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will result in a waiver of objections and will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated: February 12, 2026
      White Plains, New York

                    **RESPECTFULLY SUBMITTED:**

                    _____
                    JUDITH C. McCARTHY
                    United States Magistrate Judge